**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**Hymie SCHWARTZ and Jeannette L. Schwartz, Respondents.**

**No. 15422.**

United States Court of Appeals
Fifth Circuit.

March 14, 1956.

Loring W. Post, Sp. Asst. to Atty. Gen., H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Robert N. Anderson, Sp. Assts. to Atty. Gen., R. P. Hertzog, Acting Chief Counsel, I. R. S., Charles E. Lowery, Sp. Atty., Washington, D. C., for petitioner.

Emil Corenbleth, Dallas, Tex., for respondents.

Before HUTCHESON, Chief Judge, and RIVES and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

This Petition for Review presents for decision the question whether attorneys' fees paid by the taxpayer [1] in 1950 in connection with his income tax liabilities for prior years were deductible as ordi-

1. Hymie Schwartz, the husband, will be referred to sometimes as the taxpayer although the other respondent, Mrs. Schwartz, is also interested because a joint return was filed.

nary and necessary expense under Section 23(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(a), as held by the Tax Court; or whether they were really paid in an attempt to forestall an indictment for fraud and are, therefore, non-deductible as personal expenses under Section 24 of the Code, 26 U.S.C.A. § 24, and on grounds of public policy. For the reasons hereinafter stated we hold that the fees were deductible.

In 1949 an examination of taxpayer's books and records for the years 1942 through 1948 was begun by the Bureau of Internal Revenue. Taxpayer cooperated in the investigation and his accountant worked with the agent of the Bureau and the special agent in the investigation.

The taxpayer recognized shortly after the investigation began that additional income taxes would be due for the years under investigation, but did not believe the facts would justify imposition of any fraud penalties. From the outset taxpayer wanted his correct tax liabilities cleared up, and he persisted in that attitude from beginning to end of the negotiations here described. The main question involved was his failure to include in income proceeds from the sale of piece goods from the stock of a manufacturing concern which he owned during the years under investigation. The government agents completed the investigation in June, 1950, but the taxpayer was not advised at that time of the amount of the deficiencies in income tax and civil penalties which their report proposed should be determined, or whether civil penalties would be assessed. In fact, that information was not given him until September, 1951, after all of the events hereinafter set forth had transpired, including his indictment and the disposition of the criminal case.

Taxpayer and his auditor had conferences in July, 1950 with the Intelligence Division of the Bureau of Internal Revenue in Dallas, and also in the Chief Counsel's office of the Penal Division in the same city. Following those conferences taxpayer was notified by the Treasury Department that the case had been transferred to Washington. His attorney, Mr. Corenbleth, arranged for a conference there and engaged an accountant to assemble the information necessary for his use.

October 16, 1950, taxpayer and his attorney participated in a conference in Washington before a special attorney in the Penal Division of the Chief Counsel's Office in the Treasury Department. At the hearing taxpayer and his attorney took the same position that had been taken from the outset,—that taxpayer was willing to pay any taxes and interest which were found to be due, but was unwilling to pay any civil fraud penalties because they believe no fraud was involved. At that hearing the taxpayer's attorney filed a written statement frankly admitting that income taxes were due, but strenuously insisting that only interest should be charged and that no fraud penalties should be assessed.

Following that conference taxpayer was advised that his case had been referred to the Attorney General of the United States for further action. He thereupon employed attorneys resident in Washington to handle the matter with the Justice Department. After due preparation, they had two or more conferences with an attorney in the criminal section of the Tax Division of the Attorney General's Office. They made the same offer to pay the tax when it should be accurately determined and interest, but refused to pay any fraud penalties. The taxpayer accompanied the accountants and the attorneys in all five of the conferences mentioned and was submitted freely to questioning by the various government representatives. The attorneys' fees, aggregating $10,250, were paid during 1950 to Mr. Corenbleth and the Washington firm, whose employment and activities ceased as soon as the Government decided to refer the case to the United States Attorney at Dallas, Texas,

with recommendation of criminal prosecution.[2]

May 3, 1951, the grand jury at Dallas indicted taxpayer on four counts charging evasion of income taxes for 1944 and 1945 under Section 145(b) of the Internal Revenue Code.[3] Taxpayer then employed another attorney to handle the criminal action, paying him a fee of $6,500, and no deduction for that payment has been claimed. Taxpayer entered a plea of *nolo contendere* and was thereon found guilty and sentenced to serve a term in the federal penitentiary and to pay a fine. Later the sentence was modified by increasing the fine to $35,000 and probating the two year sentence to five years. August 13, 1951, taxpayer and his wife were furnished, for the first time, with a statement proposing deficiencies in income tax and additions to the tax for fraud. They filed protests which resulted in a decrease in the amount of tax demanded, but the fifty percent fraud penalty was paid.

On their joint return for 1950 taxpayer and his wife claimed a deduction for the fees paid to the attorneys who represented them in the negotiations and the Commissioner disallowed the deduction. The Tax Court overruled the Commissioner and held that the deduction was proper, five judges dissenting.

■ The Commissioner seeks here to set aside the finding of the Tax Court as clearly erroneous based upon his contention that the entire fee was paid in "an attempt to forestall criminal prosecution for tax evasion". The evidence touching the activities of taxpayer and his representatives consisted entirely of the testimony of taxpayer, his Dallas attorney and his Washington attorney. Each of them testified categorically that employment was accepted "to try to settle the civil liability" and all of their activities were directed towards the efforts to have the amount of the tax deficiency agreed upon and to pay the correct deficiency with interest, but without fraud penalties. Neither of the firms of attorneys had ever engaged in any criminal practice at all.

The Commissioner asks us to draw the line between expenses paid in determining liability for income taxes which are deductible under Section 23(a), and expenses paid in attempting to forestall prosecution for income tax evasion which he claims are non-deductible both under Section 24(a) and on grounds of public policy. He claims that the uncontroverted facts show that these fees fall in the category of non-deductible expense because he says they were paid in the unsuccessful attempt to prevent criminal prosecution. The evidence in the record does not sustain this contention. The three witnesses above mentioned all testified that the attorneys were employed to try to settle the tax liability only, and that their entire efforts were devoted to a continuing attempt to induce the Government to disclose the amount of taxes claimed so that they could be paid with interest but without the civil fraud penalty.[4]

2. Except that the Washington attorneys voluntarily appeared with the taxpayer before the United States Attorney at Dallas without compensation and only out of their conviction that taxpayer was innocent of fraud.

3. 26 U.S.C.A. (I.R.C.1939) § 145(b):
   "Failure to collect and pay over tax, or attempt to defeat or evade tax. Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

4. 26 U.S.C.A. (I.R.C.1939) Sec. 293(b), being a part of Chapter 1, Sub-chapter C, Supplement M, bearing the title "Interest and Additions to the Tax", provides:
   "(b) *Fraud.* If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addi-

The only evidence upon which reliance can be placed as tending to support this contention of the Commissioner was that elicited by cross-examination of each of these witnesses and was to the effect that he realized that criminal prosecution was a possibility. The questions asked by the attorneys for the Commissioner at the hearing seemed to reflect that the questioners realized that their proof could rise no higher than establishing that taxpayer and his counsel surmised that there was a possibility of criminal prosecution.[5]

Of course, the presence of the special agent at the very beginning of the examination of taxpayer's books, and all of the steps taken from then until the matter was referred to the United States Attorney for indictment, doubtless suggested that possible criminal prosecution was being considered. Yet, as far down the line as the conference in the Penal Division of the Treasury Department, the representative of the Chief Counsel stated, "The whole thing bogs down to whether or not these sales were intentionally left off—and I doubt it. It is possible, as I was going to say, that we may want to send the case back for further investigation."

The Commissioner emphasizes this point further by insisting that the taxpayer is bound to have known that criminal prosecution was a definite possibility when the Treasury Department referred the case to the Department of Justice. But the evidence is without dispute that less than one-third of those so referred eventuate in criminal prosecution.

---

tion to such deficiency) shall be assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d) (2)."

5. When taxpayer was on the stand and after he had stated, "They agreed to take the case and try to settle the civil liability in the case", he was asked by government counsel: "Weren't you concerned about how much tax and penalty you might owe, but also about the fact *there might be* a criminal charge, or criminal charges brought against you? A. I was told *there might be some,* but I didn't think they would; I didn't think the evidence would warrant it * * *. Q. And you know [knew] at that time that the Treasury Department was still considering—was still investigating you for *possible charges* under the criminal statute of the Internal Revenue Code, did you not? A. What I understood and what I was given to understand was they were investigating whether these monies were included in the returns or not, and what their findings would be, we didn't know."

When Attorney Corenbleth was on the stand he was asked: "Q. Mr. Corenbleth, at the time you were hired by Mr. Schwartz, did you not know that the Bureau of Internal Revenue was or had conducted an investigation against him, and that in addition to civil tax liabilities to be asserted against him, *there might be* criminal proceedings instituted against him? A. I want to answer that, yes, and then I want to do a little explaining about that. In any matter before the Treasury Department, it is well known that there are a number of steps to be taken before a man— * * * There are a number of steps which are taken in a tax proceeding, none of which necessarily result in criminal action, but any of *which might ultimately result in criminal* action. * * *"

The cross-examination of taxpayer's Washington attorney followed similar lines: "Q. Did you know by the fact it was referred to the Department of Justice that the institution of criminal proceedings *was being contemplated* by the Department of Justice? * * * A. I gathered that perhaps a report had gone in, but sometimes we are permitted to see the report by the Special Agent, and in Mr. Schwartz' case we had not seen any report by the Special Agent in the case, as to whether or not criminal proceedings had been recommended by the Special Agent. Q. You mean in these conferences you had with the Department of Justice, you didn't know that criminal proceedings were—A. Sir, I have often wondered what they had in mind. We didn't know it lots of times; we would try to find out, and usually, *the talk came from one side of the table.* That is the reason we made our own investigation, to determine that our client had been telling us the truth. In your question, whether or not the Government *might be thinking about a fraud penalty,* what the Government had in mind about prosecuting Mr. Schwartz, we did not know." [Emphasis added.]

Moreover, Congress has indicated that settlements are distinctly favored and has invested both Treasury and Justice officials with the authority to compromise criminal cases.[6] Nothing in the evidence or the argument here sustains the thought that this congressional policy is not translated into action in dealing with cases coming within the purview of Section 3761.

It is without controversy that the amount of tax due with civil penalties was one of the things discussed in all of the conferences and that, with the taxpayer and his counsel, this was the main thing under consideration and that their efforts were directed primarily to this aspect. The Government representatives kept their own thoughts and intentions veiled largely in secrecy, so that the Tax Court had to arrive at its motives and intentions chiefly by surmise and inference based upon the course and direction it gave to the handling of the negotiations and the implications springing therefrom.

The most favorable inference which can be drawn from what happened—the Commissioner introducing no witness on the subject—is that the agents in the field must have recommended criminal prosecution and that, despite the quoted remarks from the Treasury attorney, the Treasury Department must have submitted the matter to the Department of Justice with recommendations for criminal prosecution. But it is inescapable that, while the negotiations were in progress in the Treasury Department and in the Department of Justice at Washington, the taxes and civil penalties predominated in the Government's attitude and actions in a ratio of more than two to one, and that the emphasis of the civil aspect was so great with the taxpayer that it can be considered as virtually his exclusive motivation.

Is it contended that, under this proof showing that the civil aspects were the chief and predominant subject of discussion, deduction of the fees paid those participating in those discussions was not proper; in other words, that the entire proceeding takes its color from the slight tint of the criminal aspect? When is it contended that this civil aspect did cease to be the main one and did give way to the alleged efforts on taxpayer's part to forestall criminal prosecution? And, how did the taxpayer go about forestalling or heading off a criminal prosecution, and what steps would a taxpayer be required to take in such a direction to warrant the disallowance of such expenses? The Commissioner is silent as to these questions and fails to suggest the answer he desires that we give to either. He wants us to draw a line, yet he does not suggest where the line should be drawn or the concrete considerations which should be given weight in determining the place of the drawing.

The position of the Commissioner is equally vague with respect to the public policy he contends the allowance of this deduction violates. No authority is cited which tends to support his position, and apparently he pitches his argument on the thesis that it would be morally wrong to permit a deduction which would eventuate in what he conceives to be a contribution by the Government to resistance by a taxpayer against any exactions which may possibly develop a criminal angle somewhere along the line. On the other hand, respondent advances the thought that a sound public policy would look with favor on legitimate resistance to what are considered unreasonable demands. His Washington counsel testified, in response to a question from the Tax Court, that the Government usually used the fraud penalty "as a sort of sledge hammer over the taxpayer's head,

6. 26 U.S.C.A. (1939) § 3761 provides:
"*Compromises*—(a)  *Authorization.* The Commissioner, with the approval of the Secretary, or of the Under Secretary of the Treasury, or of an Assistant Secretary of the Treasury, may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General may compromise any such case after reference to the Department of Justice for prosecution or defense."

in a possible criminal prosecution".[7] Respondent's position may well be expressed by quoting language used by Mr. Justice Jackson[8]: "Certainly contest against unwarranted exaction, regardless of its amount or outcome, is for the conservation of property and its reasonable cost is deductible. * * * The Treasury may feel that it is good public policy to discourage taxpayers from contesting its unjustified demands for taxes and thus justify penalizing resistance. * * * I think Congress allows a taxpayer to protect his estate, even against the Treasury. It seems to me a tacit slander of the Nation's credit that need for money should drive us to such casuistry as this."

The Tax Court said very much the same thing in the Greene Motor Co. case, infra, 5 T.C. 320: "How, then, may we say that the allowance of the deductions here involved would be contrary to public policy; for if, in the interest of public policy, the Commissioner may settle a criminal matter, is it not equally within sound public policy for the taxpayer to take part in the settlement?" Under the evidence in the case now before us the argument of the taxpayer is more cogent than that of the Commissioner.

The most obvious answer to all of the Commissioner's contentions is that there is no law to support them and the cases are all the other way. We may accept the premise[9] that fines and penalties and

7. In this case the Government would not comply with the frequent requests of taxpayer to disclose the amount of tax it was demanding, but proceeded, before making such disclosure, to present the case to the grand jury, obtain an indictment, and call the criminal case for trial and obtain a plea of *nolo contendere* before bringing the discussion down to definite figures. It was not until after the criminal case was disposed of that the ninety day letter was sent out or that the taxpayer was advised of the amount of tax demanded of him. The taxpayer settled at a reduced tax figure, but paid the fifty percent civil fraud penalty.

By the adoption of such strategy the Government placed itself in position to argue the present question from the point of view of hindsight rather than of the facts as they existed when the discussions were taking place for which the legal services were rendered and paid. The propriety of deduction for these expenses must be tested by the character of the services rendered and by the situation as it existed when they were rendered, and not from the standpoint of what happened after the services had been paid for and completely performed.

8. His dissent in Lykes v. United States, 1952, 343 U.S. 118, 128–129, 72 S.Ct. 585, 590, 96 L.Ed. 791.

9. It seems to be accepted that fees paid to attorneys in an unsuccessful defense of a criminal prosecution are not deductible. The only appellate court decision cited in support of this principle is a decision rendered by the Court of the Second Circuit in 1931, Burroughs Bldg. Material

Co. v. Commissioner, 47 F.2d 178, 180. That case involved price fixing and the fine levied as the result thereof together with the legal expenses incurred in the litigation. The Court was unable to find much precedent on the subject, but finally concluded: "If the fines and costs cannot be deducted, the legal expenses incurred in litigating the question whether the taxpayer violated the law and whether fine should be imposed should naturally fall with the fines themselves."

On the other hand, the Commissioner, many years later, adopted a course of action which placed the legal expense in a different category from the amount paid in compromise of a penalty suit. In Commissioner v. Longhorn Portland Cement Co., 3 T.C. 310, the Tax Court had allowed deductions both for attorneys' fees and for the amount paid in compromise of the penalty action. The Commissioner acquiesced in the allowance of the attorneys' fees, but appealed the portion of the Tax Court's decision dealing with the compromise payment of penalties demanded for violation of Texas anti-trust laws. We reversed the Tax Court decision as to this feature, 5 Cir., 1945, 148 F.2d 276. And see generally 4 Mertens Law of Federal Income Taxation, Sec. 25.50 and the cases cited under note 93.

We do not pass upon the validity of the premise thus accepted as it is not controverted; nor do we reach the contention that the entire criminal proceeding as it was handled here was ancillary to the efforts to collect taxes and civil penalties.

fees in unsuccessful defense of litigation instituted to enforce them are not deductible. But the line has not been advanced beyond the handling of legal proceedings having an unsuccessful termination. And, under the facts in this record, there is no place where the line can logically be drawn short of the defense of a criminal prosecution.

Nor does the law favor the Commissioner's contentions any more than the facts. The principle for which he contends was ruled against him in a Tax Court case [10] from which the Commissioner took no appeal, but in which he apparently acquiesced. The charges there discussed embraced both civil and criminal penalties. The Tax Court analyzed several recently decided Supreme Court cases and held that, under them, the deduction was proper on the grounds that the expenditures were remote from criminal liability, that Congress had specifically invested the Commissioner with the right to make settlement of criminal charges, and that no "sharply defined" public policy was pointed out as being transgressed, even if it should be tempted to enter the legislative field in an effort to define such a policy.[11]

The Supreme Court cases upon which the Tax Court predicated its Greene decision sustain the correctness of that decision. The Heininger case, for example, involved the deductibility of attorneys' fees paid in an unsuccessful attempt to enjoin a fraud order of the Postmaster General barring Heininger's advertising matter from the mails. The Supreme Court held that the legal services were " 'ordinary and necessary' " as well as "normal", and that the expenses were properly deductible, using in part this language: "It has never been thought, however, that the mere fact that an expenditure bears a remote relation to an illegal act makes it nondeductible. The language of Section 23(a) contains no express reference to the lawful or unlawful character of the business expenses which are declared to be deductible. * * The single policy of these sections [39 U. S.C.A. Secs. 259 and 732] is to protect the public from fraudulent practices committed through the use of the mails. * * * Nor is it their policy to deter

---

10. Greene Motor Co. v. Commissioner, 1945, 5 T.C. 314. The stipulated facts showed a compromise made by the taxpayer of the charges of "making false and fraudulent income tax returns * * and evasion of the payment of income and excess profit taxes * * * together with penalty and interest. * * * The sum * * * is hereby tendered voluntarily with request that it be accepted in compromise of the said liability * * together with any criminal liability incident thereto."

The stipulation further showed that the questioned fees were paid for services rendered by attorneys representing the taxpayer before the Bureau of Internal Revenue in connection with an asserted liability "for deficiencies in income tax * * * together with penalties as provided by Section 293(b) and 145 of the Revenue Act of 1938. * *," —in other words, under the civil fraud section and under the criminal section.

11. In the Greene case the Tax Court quoted from Heininger v. Commissioner, 7 Cir., 1943, 133 F.2d 567, affirmed 320 U.S. 467, 64 S.Ct. 249, 253, 88 L.Ed. 171, language which points out that the establishment of public policy such as this belongs essentially to Congress, 5 T.C. 320, Note 3:

"In the Heininger case, the Circuit Court of Appeals for the Seventh Circuit, in referring to such distinction [i. e., between the lawful or unlawful character of the business expense] said:

" '* * * Congress has not said that discrimination shall be made. Neither has the Department had the hardihood to make such a material change by way of its regulations. If this change is to be made and the policy altered, let Congress do it. Congress would need only to add the word "legal" before the word "trade" in the third line of Section 23(a) (1).

" 'We are asked, in the guise of construing the words "ordinary and necessary", to amend the statute. In other words, to engage in a little judicial legislation. We decline the invitation'."

But see the contrary idea as expressed by the Court of the Fourth Circuit in Lilly v. Commissioner, 1951, 188 F.2d 269, reversed 343 U.S. 90, 72 S.Ct. 497, 96 L.Ed. 769.

persons accused of violating their terms from employing counsel to assist in presenting a bona fide defense to a proposed fraud order."

The latest pronouncement of the Supreme Court on the subject, Lilly v. Commissioner, 1952, 343 U.S. 90, 72 S.Ct. 497, 96 L.Ed. 769, tends to restrict further the violations of public policy which will support a disallowance of deductions similar to those involved here. Lilly was conducting a business of large proportions under which fees for manufacturing eyeglasses were shared with the doctors who prescribed them. Such a practice was universally condemned by members of the medical profession and had been brought under statutory inhibition in a few states. The Tax Court sustained disallowance by the Commissioner of these fees "because it held that, as a matter of law, the contracts under which the payments were made violated public policy"; and the Court of the Fourth Circuit affirmed, 188 F.2d 269. The Supreme Court did not agree and stated its reasons thus, 343 U.S. at pages 96–97, 72 S.Ct. at page 501:

"Assuming for the sake of argument that, under some circumstances, business expenditures which are ordinary and necessary in the generally accepted meanings of those words may not be deductible * * when they 'frustrate sharply defined national or state policies proscribing particular types of conduct,' * * * nevertheless the expenditures now before us do not fall in that class. The policies frustrated must be national or state policies evidenced by some governmental declaration of them. In 1943 and 1944 there were no such declared public policies proscribing the payments which were made by petitioners to the doctors.

"Customs and the actions of organized professional organizations have an appropriate place in determining in a factual sense what are ordinary and necessary expenses at a given time and place. * * *

They do not, however, in themselves constitute the 'sharply defined national or state policies' the frustration of which may, as a matter of law, preclude the deductibility of an expense under § 23(a) (1) (A)."

Even if we were persuaded to enter the field of public policy belonging essentially to the legislative branch of the Government, we would not be tempted to undo what the Tax Court did here in declaring deductible legal expenses covering services rendered entirely before the institution of criminal prosecution. We think its decision was right and it is

Affirmed.

RIVES, Circuit Judge, dissents.

RIVES, Circuit Judge (dissenting).

According to my understanding of the record, the undisputed facts established that most, if not all, of the attorneys' fees in question were paid in an unsuccessful attempt to prevent criminal prosecution. The taxpayer claimed no deduction of the amount of the attorney's fee paid for the handling of the case after the return of the indictment, because a taxpayer who has been prosecuted and convicted of a crime cannot take a tax deduction for an attorney's fee incurred in his defense. Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 473, 64 S.Ct. 249, 88 L.Ed. 171; Commissioner of Internal Revenue v. Longhorn Portland Cement Co., 5 Cir., 148 F.2d 276; 4 Mertens, Law of Federal Income Taxation, § 25.36.

It seems to me the fact that the fees here involved were paid for services which antedated the indictment affords no sound basis for a distinction so far as tax deductions are concerned. The fees, I think, were not deductible ordinary and necessary expenses under Section 23(a), but were non-deductible personal expenses under Section 24 of the Code. Further, I think, the deduction of the fees would frustrate the sharply defined public policy against tax evasion embodied in Section 145(b) of the Code.

I, therefore, respectfully dissent.