CECIL R. HOPKINS AND RUTH O. HOPKINS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56882. Filed August 8, 1958.

*John Y. Merrell, Esq.*, for the petitioners.
*Jack D. Yarbrough, Esq.*, for the respondent.

The respondent determined deficiencies in income tax against the petitioners for the years 1949 and 1950 in the respective amounts of $6,598.85 and $2,367.42. The questions for decision are (1) whether petitioners are entitled to deductions for legal fees and expenses of $11,250 paid in 1949 and $3,770.39 paid in 1950, and (2) whether they are entitled to a deduction for deposits of $25 made at Christmas time in 1949 in a savings account for each child of Cecil R. Hopkins' employees.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found as stipulated.

Petitioners are husband and wife, and are residents of Bristol, Tennessee. They filed joint income tax returns for the years herein with the collector of internal revenue for Tennessee. Their books were kept and their income tax returns were prepared by the calendar year and on an accrual basis of accounting.

Cecil R. Hopkins, hereafter referred to as petitioner, and Fred C. Ault acquired control of a corporation known as Automotive Service and Supply, which was engaged in the wholesale and retail selling of automotive parts, accessories, and service. The corporation was dissolved on April 1, 1942, and petitioner and Ault continued the business as equal partners. The partnership operated one store in Kingsport, Tennessee, and another store in Bristol, Virginia. The partnership was terminated in April of 1945, with Ault acquiring the Kingsport store and the petitioner the Bristol store. In October of 1945, petitioner purchased the Kingsport store from Ault. From that time through and including the year 1950, petitioner owned and operated both stores as a sole proprietorship under the name of Automotive Service and Supply.

For the years 1943 through 1948 the petitioner knowingly made false and fraudulent income tax returns, understating both his taxable income and the tax due thereon from him. The returns for the years 1943 through 1946 were the returns of the petitioner alone, while the

returns for 1947 and 1948 were joint returns with his wife. In substantial part, if not wholly, the understatements of income were the result of petitioner's withholding from the books of account the business done with a number of customers and the failure to include in his income tax returns the income derived from such business.

Under date of November 11, 1949, petitioner received a letter from an internal revenue agent, advising that the agent would visit him on November 14, 1949. When the agent called, he explained that he wanted to check petitioner's books, and petitioner made those books available to him. In the beginning, the investigation was intended to cover petitioner's income tax liability for the years 1947 and 1948. Due to resulting developments, the investigation was expanded to include the years 1943 through 1946. On November 16, 1949, the agent advised petitioner that there were questions which needed to be answered in regard to petitioner's income. Petitioner assured him that the answers would be forthcoming.

Knowing of the omissions of income from his books and income tax returns, the petitioner discussed the investigation with his accountant, who recommended that he employ Robert Ash, a lawyer, of Washington, D. C.

On November 16, 1949, the date on which the revenue agent advised petitioner that there were questions which needed to be answered, the petitioner, by telephone, arranged for an appointment with Ash in New Orleans, Louisiana. Shortly thereafter, they conferred in Ash's hotel room in New Orleans. At the conference, Ash examined petitioner's balance sheet, which petitioner had brought with him; they discussed the possibility of criminal action against petitioner; also the retainer fee which petitioner would pay. Petitioner expressed concern as to the effect the case against him might have on his business, and asked that the matter be handled so as to minimize that effect.

Following the New Orleans conference, Ash, under date of November 21, 1949, wrote petitioner at Post Office Box 950, Bristol, Virginia, as follows:

As I told you in New Orleans the other day, it will take the Treasury Department a long time to decide what action to take in your case. If the investigation is confined to the years 1946, 1947 and 1948 it may be as long as three years before the case is finally disposed of.

At this time it is impossible for me to say just what the final result will be. It is obvious, however, that the case must be very carefully watched and efforts made at every opportunity to dispose of it without having the department take criminal action. As explained to you in New Orleans, it will be possible to discuss the case with at least six or seven different groups of officials. With luck it may be possible to dispose of the case as a result of one of these conferences. You should be advised, however, that ordinarily cases of this type are not finally disposed of until they reach the higher officials.

As I told you in New Orleans, I think a fair fee for handling the case would be as follows:

(1) A retainer of $15,000; $7500 of this retainer would be payable now, and $7500 in January 1950.

(2) No further fee would be paid unless the case is disposed of without your being required to serve time in the penitentiary.

(3) In the event the case is disposed of without your being imprisoned, there will be a further fee of $15,000.

(4) You will pay the out-of-pocket costs. These will not be great and will consist principally of travelling expenses.

Two days later, on November 23, 1949, Ash, both by telephone and by letter, advised petitioner that he should refuse to give further information to the revenue agent. The letter read as follows:

As stated to you over the telephone today, it is my opinion that you should advise Revenue Agent Russell that upon advice of counsel you do not care to make any statement with respect to your tax liability. As I told you, the Bureau of Internal Revenue cannot compel you to give any statement. Likewise, do not give the examining officers any books or records other than those which you have already submitted to them.

The reason for the foregoing advice is that it has been my experience that if a taxpayer confesses what he has done, administrative officials take the position that they have no alternative but to indict. At the present time I have a case pending in the office where the Bureau is taking exactly that position.

The petitioner did not follow the advice given him by Ash but decided to disclose fully all of the facts with respect to his income, and when that decision was reached, Ash supported him in that effort. So far as Ash was aware, petitioner disclosed all the facts to the revenue agent.

On November 28, 1949, Ash met with the revenue agent and was told that the indication was that petitioner's income had been substantially understated. Ash told the agent that petitioner had indicated that he wanted to make a complete disclosure on the case and get the matter straightened out completely. The agent advised Ash that he could make no commitments of any immunity from criminal prosecution. Ash, knowing such was the case, did not press the matter.

On November 30, 1949, the petitioner submitted to the revenue agent a list of 18 customers, the sales to whom had been omitted from his records, and as a result of that revelation, the agent submitted a report to Nashville, suggesting that a representative of the Intelligence Unit be assigned to the case.

On January 16, 1950, a special agent from the Intelligence Unit was assigned to the case. He began his investigation on January 24, 1950, with a conference in Bristol, Tennessee, attended by petitioner, his accountant, and John Y. Merrell, who represented himself as a staff member of the Robert Ash law firm in Washington and had a power

of attorney authorizing him to represent petitioner. Merrell, agreeing that no immunity from prosecution had been promised to petitioner, stated that he was well aware that the criminal aspects of the case "were imminent."

After the entry of the special agent into the case and during his investigation, the revenue agent at no time discussed with petitioner anything in the nature of a civil settlement of his income tax case. It was a policy of Internal Revenue that settlement of civil liability be held up pending disposition of any criminal action. At no time did the special agent discuss anything other than matters relating to criminal liability.

Petitioner did not want criminal proceedings instituted against him, he did not want to be indicted, nor did he want his case to proceed to trial. Ash directed his efforts toward keeping criminal prosecution from being instituted against petitioner, and during the investigation by the special agent Merrell endeavored to show the agent why he should not recommend that petitioner be so prosecuted. Some of the reasons advanced were that petitioner had cooperated during the investigation; his character was good; that the omissions were small when compared to total income; that over one-half of the correct tax liability had been paid voluntarily; that petitioner was of economic value to his community; and that he was in poor health.

A final conference was held with the special agent and his superiors in Lexington, Kentucky, on May 9, 1950. Participating in the conference for petitioner were Ash and Merrell. They would not permit petitioner to be present. The conference was restricted to the years 1946, 1947, and 1948, and only the criminal aspects of the case were discussed. The reasons given to the special agent and his superiors were the same as those which had been advanced by Merrell to the special agent. Stressed particularly was the cooperation petitioner had displayed. Because of the claim as to petitioner's health, the Government's facilities at Lexington were used to examine petitioner, and he was found sufficiently able to stand trial. The petitioner submitted voluntarily to the physical examination.

Under date of June 23, 1950, the special agent made his final report, in which he recommended that criminal proceedings be instituted against petitioner for the willful and deliberate attempt to evade taxes for the years 1946, 1947, and 1948. Ash was advised that criminal prosecution was being recommended.

Under the employment and as shown by his letter of November 21, 1949, Ash represented petitioner until September 1950, when, at the request of petitioner, he withdrew from the case. He did not represent petitioner in the further proceedings before the Bureau of Internal Revenue, the Department of Justice, or the courts.

To cover the fees and expenses due him in the case, petitioner accrued and made payments to Ash as follows:

| Date | Amount | |
|---|---|---|
| Dec. 1, 1949 | $7, 500. 00 | (Part of retainer) |
| Dec. 31, 1949 [1] | 3, 750. 00 | (Part of retainer) |
| May 5, 1950 | 2, 250. 00 | (Part of retainer) |
| May 5, 1950 | 10. 26 | (Expenses) |
| June 22, 1950 | 10. 13 | (Expenses) |
| June 22, 1950 | 1, 500. 00 | (Balance of retainer) |

[1] Accrued, but paid on Jan. 25, 1950.

The above payments were recorded on the books of Automotive Service and Supply, and were deducted as legal expenses in petitioners' joint returns for the years 1949 and 1950 in the respective amounts of $11,250 and $3,770.39. During the years 1943 through 1950 the books and records of Automotive Service and Supply were maintained on an accrual basis of accounting.

On June 20, 1952, petitioner was indicted by a grand jury in the United States District Court for the Middle District of Tennessee, at Nashville, on charges of willfully and knowingly attempting to evade income taxes for the years 1946, 1947, and 1948, by filing false and fraudulent income tax returns for those years, in violation of section 145 (b) of the Internal Revenue Code of 1939. Petitioner was arraigned on October 8, 1952, and entered a plea of not guilty to the charges in the indictment. On some undisclosed date, the case was transferred from the District Court for the Middle District of Tennessee to the District Court for the Eastern District of Tennessee.[1] On September 21, 1954, petitioner withdrew his plea of not guilty to counts 2 and 3 of the indictment, relating to the years 1947 and 1948, and entered a plea of guilty as to those years. On the same day, the Government moved to dismiss count 1 of the indictment, relating to the year 1946, and this count was dismissed by the court. On his plea of guilty, petitioner, on March 9, 1955, was fined $10,000 on count 2 of the indictment for the year 1947, and $10,000 on count 3 of the indictment for the year 1948. Costs of prosecution were also assessed against him. The fines and costs so imposed were paid by petitioner.

After the petitioner was indicted, he engaged counsel to handle his case in the Federal District Court. A total of $5,000 was paid for such services, petitioner's personal checks therefor being issued. as follows:

---

[1] Petitioner had been advised by counsel that a plea of not guilty was necessary, in order to effect a transfer of his case to the United States District Court for the Eastern District of Tennessee. The Eastern District was petitioner's home district.

| Date | Payee | Amount |
|------|-------|--------|
| June 22, 1952 | McDaniel & Ring | $500 |
| Oct. 1, 1954 | John Y. Merrell | 500 |
| Mar. 10, 1955 | John Y. Merrell | 1,000 |
| Apr. 23, 1955 | John Y. Merrell | 1,000 |
| Aug. 4, 1955 | John Y. Merrell | 500 |
| Nov. 19, 1955 | John Y. Merrell | 500 |
| Feb. 1, 1956 | John Y. Merrell | 500 |
| Mar. 9, 1956 | John Y. Merrell | 500 |
| | | 5,000 |

All of the checks appear to have been cleared through the same bank in Washington, D. C.

Petitioner claimed no deductions in any of his income tax returns for the payments making up the above $5,000.

Although the revenue agent did not discuss with petitioner anything in the nature of a civil settlement of his income tax case pending disposition of the criminal aspects of the case, he did proceed with his investigation of petitioner's income tax liability, and on some undisclosed date made his report thereon, proposing a deficiency in tax and a 50 per cent addition thereto for fraud for each of the years 1943 to 1948, inclusive. Also on some undisclosed date, the revenue agent possibly stated to petitioner and his counsel the amounts he had recommended as the income tax deficiencies and additions thereto.

At some time in the course of the investigation, petitioner supplied the revenue agent with the names of three additional customers as being customers whose purchases had not been recorded or reported. It developed that one of the three names was a duplication.

The supplying by petitioner of the names of customers whose purchases had not been recorded or reported materially aided and expedited the work of the revenue agent in arriving at his proposed deficiencies and additions to tax. Without this assistance, he would have had difficulty in learning of the business done with 5 of the 20 customers, and possibly would not have obtained the information with respect thereto. In addition to eliminating the 1 customer as a duplication, the revenue agent discovered and allowed some items of deduction which petitioner had not claimed.

The net income and income tax liability reported by petitioner on his returns for the years 1943 to 1946, inclusive, and the net income and income tax liability reported by the petitioners on their joint income tax returns for the years 1947 and 1948, were as follows:

| Year | Net income | Income tax liability |
|------|-----------|----------------------|
| 1943 | $18,147.22 | $5,995.69 |
| 1944 | 19,217.96 | 6,370.52 |
| 1945 | 40,959.61 | 20,235.93 |
| 1946 | 56,170.61 | 28,450.56 |
| 1947 | 61,092.84 | 31,957.65 |
| 1948 | 57,958.61 | 20,803.98 |

The additional net income, additional income tax and the additions to tax under section 293 (b) of the 1939 Code, proposed by the revenue agent for the years 1943 to 1948, inclusive, were as follows:

| Year | Additional net income | Additional income tax | Additions to tax |
|---|---|---|---|
| 1943 | $750.00 | $387.60 | $193.80 |
| 1944 | 1,200.00 | 648.54 | 324.27 |
| 1945 | 4,418.90 | 3,074.36 | 1,537.18 |
| 1946 | 12,331.42 | 8,971.44 | 4,485.72 |
| 1947 | 18,797.64 | 14,128.07 | 7,064.04 |
| 1948 | 29,975.44 | 17,258.70 | 8,629.35 |

The following schedule shows the dates and the amounts of certain sums of money received from the petitioner by the district director of internal revenue for Tennessee, at Nashville. These payments were placed in an unclassified suspense account by the district director until the petitioner's additional income tax liability for the years 1943 to 1948, inclusive, had been assessed by him. This assessment was made on December 15, 1954. Upon such assessment, these payments were transferred from the unclassified suspense account and applied to the assessment made by the district director.

| Date | Amount | Date | Amount |
|---|---|---|---|
| Jan. 31, 1951 | $7,000.00 | Dec. 1, 1952 | $1,000.00 |
| Apr. 23, 1951 | 1,500.00 | Feb. 10, 1953 | 3,000.00 |
| May 31, 1951 | 1,000.00 | May 1, 1953 | 2,500.00 |
| July 9, 1951 | 1,000.00 | Sept. 5, 1953 | 1,500.00 |
| Sept. 24, 1951 | 750.00 | Feb. 16, 1954 | 1,000.00 |
| Nov. 2, 1951 | 750.00 | June 1, 1954 | 2,500.00 |
| Dec. 18, 1951 | 750.00 | Aug. 18, 1954 | 2,500.00 |
| Feb. 28, 1952 | 750.00 | Dec. 2, 1954 | 36,703.07 |
| Sept. 22, 1952 | 2,500.00 | | |
| | | Total | 66,703.07 |

The following schedule is a summary of all payments made by the petitioner to the district director on account of his additional income tax liability for the years 1943 to 1948, inclusive. This schedule includes the payments as shown above.

| Year | Additional income tax | Additions to tax, sec. 293 (b) | Interest |
|---|---|---|---|
| 1943 | $387.50 | $193.80 | $160.74 |
| 1944 | 648.54 | 324.27 | 229.83 |
| 1945 | 3,074.46 | 1,537.18 | 904.15 |
| 1946 | 8,971.44 | 4,485.72 | 2,305.83 |
| 1947 | 14,128.07 | 7,064.04 | 5,278.44 |
| 1948 | 17,258.70 | 8,629.35 | 5,935.20 |
| | 44,468.71 | 22,234.36 | 14,814.19 |

Ash was employed by petitioner and his fees and expenses were paid primarily for the efforts of Ash in attempting to obviate or prevent

criminal prosecution of petitioner for income tax fraud, and any services which Ash or Merrell may have rendered to petitioner under such employment which was directed to his liability for income tax and additions thereto for fraud were entirely secondary and incidental.

At Christmas time in 1949 petitioner deposited $25 in a savings account for each child of his employees. Under the employment contracts with his employees, petitioner was not obligated to do this. He had gone no farther than the seventh grade in school, and he wanted to see the children of his employees obtain an education. He felt that it would help his business, because the morale of his employees would be improved if they knew petitioner had an interest in their children as well as themselves. The total of such deposits was $675, which amount petitioner deducted as a business expense in the joint return for 1949. Petitioner also paid his employees a Christmas bonus.

In his determination of deficiencies for 1949 and 1950, the respondent disallowed the claimed deductions covering the payment of legal fees and expenses made to Ash, and the $675 which had been deposited in the savings accounts for the children of petitioner's employees.

## OPINION.

TURNER, *Judge:* It is the claim of petitioners that the legal fees and expenses paid by petitioner Cecil R. Hopkins to Ash were either ordinary and necessary expenses incurred and paid by him in carrying on his automotive supply business, within the meaning of section 23 (a) (1) (A) of the Internal Revenue Code of 1939, or were ordinary and necessary expenses incurred and paid for the management, conservation, or maintenance of property held for the production of income, within the meaning of section 23 (a) (2),[2] and are deductible as such.

It has been held, and is now settled law, we think, that legal fees and expenses incurred and paid by a taxpayer in litigating his liability for income tax or in contesting an asserted liability therefor before governmental agencies are sufficiently related to the carrying on of the trade or business which produced the income, or to the management, conservation, or maintenance of property held for the production of income and from which the income was derived, to constitute ordinary and necessary expenses within the meaning of section 23 (a) (1) (A), and make them deductible thereunder. *Bingham's Trust*

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
  In computing net income there shall be allowed as deductions:
  (a) EXPENSES.—
    (1) TRADE OR BUSINESS EXPENSES.—
      (A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *

     *      *      *      *      *      *      *

    (2) NON-TRADE OR NON-BUSINESS EXPENSES.—In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

v. *Commissioner*, 325 U. S. 365; *Commissioner* v. *Schwartz*, 232 F. 2d 94, affirming 22 T. C. 717; *James J. Standing*, 28 T. C. 789; *James A. Connelly*, 6 T. C. 744; and *Greene Motor Co.*, 5 T. C. 314.

On the other hand, it has been held, and also appears well settled, that legal fees and expenses incurred and paid by a taxpayer in his defense in a trial where he was tried and convicted of willful failure to file an income tax return, or wherein he was convicted of other criminal charges, are not deductible. *Acker* v. *Commissioner*, 258 F. 2d 568, affirming a Memorandum Opinion of this Court; *Burroughs Building Material Co.* v. *Commissioner*, 47 F. 2d 178, affirming 18 B. T. A. 101; *Thomas A. Joseph*, 26 T. C. 562; *C. W. Thomas*, 16 T. C. 1417; *Estate of John W. Thompson*, 21 B. T. A. 568; *Sanitary Earthenware Specialty Co.*, 19 B. T. A. 641; *John Stephens*, 2 B. T. A. 724; *Norvin R. Lindheim*, 2 B. T. A. 229; and *Sarah Backer*, 1 B. T. A. 214. See *Commissioner* v. *Heininger*, 320 U. S. 467, 473.

In the instant case, the petitioner never at any time after he was advised by the revenue agent on November 16, 1949, that there were questions which needed to be answered, contested or resisted his liability to the income tax itself or to the additions to tax for fraud. The employment of Ash and the services rendered by him and by Merrell under that employment are shown to have been directed to the prevention of criminal prosecution of petitioner, and whatever services, if any, which related to the liability for income tax and for the civil sanctions were secondary and incidental.

While the income involved was business income from the operation of petitioner's business, certainly there is no basis for saying that the knowing omission of the said income from petitioner's books of account and from his income tax returns was an ordinary and necessary act in the carrying on of the business and in the earning of the income. It is equally patent, we think, that the legal fees and expenses paid for services predominantly or primarily for the prevention of criminal prosecution for such knowing failure to report income are likewise too remote from the carrying on of the business or the preservation of income-producing property to constitute ordinary and necessary expenses in connection therewith.

In his endeavor to bring his case within the line of cases first cited above, the petitioner relies particularly on *Commissioner* v. *Schwartz*, *supra*, pointing out that in that case, as in this case, the taxpayer was subsequently indicted and found guilty of income tax fraud, but there, as here, the indictment had not been returned until after the lawyers, the deduction of whose fees was in question, were no longer in the case; that in that case, as in this case, other attorneys represented the taxpayer from and after the indictment, and there was no claim of

deduction of the fees paid to those attorneys. It is sufficient, for the purposes here, to point out that in the *Schwartz* case, the court, in holding that the fees in question were deductible, pointed out and stressed the fact that the record there disclosed that the said fees and expenses as paid were predominantly related to services in resisting the liability for taxes and "civil penalties."

We are persuaded and convinced by the evidence, and we have found as a fact, that Ash was employed and his fees and expenses were paid by petitioner primarily for the efforts of Ash to obviate or prevent criminal prosecution of petitioner for income tax fraud, for which petitioner was indicted and plead guilty. If either Ash or Merrell performed any services under the employment herein which were directed to petitioner's liability for income tax and for the additions thereto for fraud, neither the particular services nor the extent thereof are shown of record.

We accordingly hold that the fees and expenses paid to Ash by petitioner were not ordinary and necessary expenses incurred and paid by petitioner in carrying on his business, or incurred and paid for the management, conservation, or maintenance of property held for the production of income, and are not deductible under section 23 (a) (1) (A) or section 23 (a) (2).

The deposits of $25 made by petitioner in savings accounts for each of the children of his employees at Christmas time in 1949 were, in our opinion, ordinary and necessary expenses incurred and paid in carrying on petitioner's automotive supply business, and the respondent was in error in disallowing the deduction claimed therefor.

It is true that petitioner was not legally obligated to make the deposits under the employment contracts with his employees and one of the motives for making the deposits was petitioner's desire to contribute that much of a start toward the education of the children. The deposits were made, however, only to the account of and for the benefit of children who were the children of his employees, and petitioner felt that it would help his business, because the morale of those employees would be improved knowing that petitioner was interested in their children as well as themselves. Such an anticipated increase in the morale and interest of the employees in the business leads to the conclusion that the deposits were proximately related to petitioner's business, and are deductible as ordinary and necessary expenses. The fact that the deposits were voluntary does not bar the deduction. See in that connection *Lucas* v. *Ox Fibre Brush Co.*, 281 U. S. 115; and *Champion Spark Plug Co.*, 30 T. C. 295.

*Decision will be entered under Rule 50.*