**Walter F. TELLIER and Evelyn H. Tellier, Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 29, Docket 28823.**

United States Court of Appeals
Second Circuit.

Argued Oct. 8, 1964.

Decided Feb. 16, 1965.

Michael Kaminsky, New York City (Whitman, Ransom & Coulson, New York City, on the brief), for petitioners.

Robert A. Bernstein, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, of counsel), for respondent.

First issue before LUMBARD, Chief Judge, and HAYS and ANDERSON, Circuit Judges.

Second issue before LUMBARD, Chief Judge, and WATERMAN, FRIENDLY, SMITH, KAUFMAN, HAYS, MARSHALL and ANDERSON, Circuit Judges.

HAYS, Circuit Judge.

## I.

The first issue in this case is whether the profits realized from the sale by the taxpayer (Evelyn H. Tellier is a party only because she and her husband filed a joint return) of certain securities during the years 1952–1956 were taxable as ordinary income rather than as capital gain. The resolution of this issue turns upon whether the securities were held by the taxpayer for sale to customers in the ordinary course of his business of underwriting and selling securities. If they were so held, then under Section 117(a) (1) (A) of the Internal Revenue Code of 1939 (Section 1221(1) of the 1954 Code) [1] the profits were taxable as ordinary income.

There is ample evidence to support the Tax Court's finding that the taxpayer held the securities for sale in the ordinary course of business. The taxpayer was engaged through Tellier and Company, in form a partnership but in fact wholly controlled by the taxpayer, in the business of underwriting the public sale of stock offerings and in purchasing securities for resale to customers. In connection with the underwriting agreements the taxpayer himself received stock or stock warrants which he sold, frequently through Tellier and Company.

There were seventy separate transactions of this kind during the years in question and the net gains from these sales were:

| | |
|---|---|
| 1952 | $74,755.33 |
| 1953 | 74,089.23 |
| 1954 | 49,184.05 |
| 1955 | 97,864.12 |
| 1956 | 13,277.42 |

On some occasions as an inducement to make more sales of the publicly issued shares, taxpayer would give Tellier and Company's salesmen a part of his stock warrants. Tellier and Company had at all times free call upon the securities which taxpayer kept in an "investment account." The cashier of Tellier and Company had authority to borrow any security it might need either because of a short sale or because a security was not received.

In the words of the Tax Court:

"The volume of sales, petitioner's activities with respect to the securities, and the close relationship between petitioner's investment accounts and the dealing activities of his trade or business * * *."

---

1. Int.Rev.Code of 1939, § 117:

"CAPITAL GAINS AND LOSSES

"(a) Definitions. As used in this chapter—

"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course

Int.Rev.Code of 1954, § 1221:

"CAPITAL ASSET DEFINED

"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *."

.Tellier and Company support the conclusion that the securities here involved were being held by petitioners for sale to customers in the ordinary course of their trade or business." [2]

Affirmed.

HAYS, Circuit Judge (with whom LUMBARD, Chief Judge, and WATERMAN, FRIENDLY, SMITH, KAUFMAN, MARSHALL and ANDERSON, Circuit Judges, concur).

## II.

■ The second issue presented in this case is whether legal expenses for the unsuccessful defense of a criminal action are deductible. We have decided that this problem, though long considered as authoritatively answered in this Circuit, should be reexamined. [3]

Taxpayer was tried and convicted on a thirty-six count indictment charging him with violations of the fraud section of the Securities Act of 1933, [4] with violations of the mail fraud statute, [5] and with conspiracy to violate these statutes. [6] He was sentenced to four and one-half years of imprisonment on each count, the sentences to run concurrently, and was fined $18,000. He claimed a deduction in 1956 in the amount of $22,964.20, representing expenditures during that year incurred in his defense in the criminal proceeding. The Commissioner disallowed this deduction and his ruling was sustained by the Tax Court.

In disallowing a deduction for the expenses of an unsuccessful defense of a criminal action the tax authorities are following a purely judge-made rule. There is nothing in the statute which dictates or even suggests such a result.

The applicable provision is Section 162 of the 1954 Code which provides:

"There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *."

There is no provision which expressly prohibits the deduction of the expenses of an unsuccessful defense. The general prohibition on deductions, Section 262, reads:

"Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses."

That the framers of the legislation did not intend that it should be used for moral reform is indicated by the following bit of legislative history: In the Senate debate over the provision with respect to business losses, objection was raised to its liberality. It was suggested that deductions for losses be permitted only when incurred in a "legitimate" trade or business. The suggestion was rejected. Senator Williams, who was in charge of the income tax sections of the bill, explained that the object of the bill was

"to tax a man's net income; that is to say, what he has at the end of the year after deducting from his receipts his expenditures or losses. It is not to reform men's moral characters, that is not the object of the bill at all. The tax is not levied for the purpose of restraining people from betting on horse races or upon 'futures,' but the tax is framed for the purpose of making a man pay upon his net income, his actual profit during the year." 50 Cong.Rec. 3849 (1913).

2. T.C.Memo.1963–212, 22 CCH Tax Ct. Mem. 1062, 1069.

3. After the appeal on this issue was heard by a panel consisting of Chief Judge Lumbard and Circuit Judges Hays and Anderson, the qualified judges of this Court agreed that the appeal should be considered *en banc*.

The appeal brought into question a principle which heretofore had been well settled by a prior decision of this Court. It was felt that we should reverse a previous categorical ruling of the Court only by vote of all the qualified circuit judges considering the question *en banc*.

4. § 17, 48 Stat. 84 (1933), as amended, 15 U.S.C. § 77q(a) (1958).

5. 18 U.S.C. § 1341 (1958).

6. 18 U.S.C. § 371 (1958).

In 1951 Congress rejected a proposal for disallowing deductions under Section 162 "for any expense paid or incurred in or as a result of illegal wagering" on the ground that the Internal Revenue Code was not intended to penalize or prohibit unlawful activities.[7]

Randolph Paul said:

"As exploration of relevant Congressional debates indicates, Section 23(a) (1) (A) [Section 162(a)] is not an essay in morality, designed to encourage virtue and discourage sin. It 'was not contrived as an arm of the law to enforce State criminal statutes by augmenting the punishment which the State inflicts.' Nor was it contrived to implement the various regulatory statutes which Congress has from time to time enacted. The provision is more modestly concerned with 'commercial net income'—a businessman's net accretion in wealth during the taxable year after due allowance for the operating costs of the business. * * There is no evidence in the Section of an attempt to punish taxpayers * * * when the Commissioner feels that a state or federal statute has been flouted. The statute hardly operates 'in a vacuum,' if it serves its own vital function and leaves other problems to other statutes. When Congress has wished to deny tax deductions as a means of reinforcing the sanctions of other federal statutes, it has done so deliberately and explicitly."[8]

No Supreme Court case lends any support to the rule that the legal expenses of an unsuccessful criminal defense when paid or incurred in connection with the carrying on of a trade or business are not deductible. In fact the Court has cast doubt on the rule by what it has said with respect to the reasons ordinarily given to justify the existence of the rule. These reasons are: first, that the expenses occasioned by unlawful activities are not ordinary and necessary in the conduct of a business [9] and second that the allowance of a deduction for such expenses would be contrary to public policy.[10]

Of the legal expenses of resisting issuance by the Postmaster General of a fraud order, the Court said in Commissioner v. Heininger, 320 U.S. 467, 470, 471, 472, 64 S.Ct. 249, 252, 253, 88 L.Ed. 171 (1943):

"There can be no doubt that the legal expenses of respondent were directly connected with 'carrying on' his business. * * *

"It is plain that respondent's legal expenses were both 'ordinary and necessary' if those words be given their commonly accepted meaning. For respondent to employ a lawyer to defend his business from threatened destruction was 'normal'; it was the response ordinarily to be expected. Cf. Deputy v. du Pont, 308 U.S. 488, 495 [60 S.Ct. 363, 467, 84 L.Ed. 416 (1940)]; Welch v. Helvering, 290 U.S. 111, 114 [54 S.Ct. 8, 9, 78 L.Ed. 212 (1933)]; Kornhauser v. United States [276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505 (1928)]. * * * Since the record contains no suggestion that the defense was in bad faith or that the attorney's fees were unreasonable, the expenses incurred in defending the business can also be assumed appropriate and helpful, and therefore 'necessary.' * * *

---

7. 97 Cong.Rec. 12230–44 (1951).

8. The Use of Public Policy by the Commissioner in Disallowing Deductions, Proceedings Tax Inst. Univ. of So. Calif. School of Law 715, 730–31 (1954), quoting Member Sternhagen, dissenting in Burroughs Bldg. Material Co., 18 B.T.A. 101, 105 (1929), aff'd, 47 F.2d 178 (2d Cir. 1931). (Footnotes omitted.)

9. See, e.g., National Outdoor Advertising Bureau v. Helvering, 89 F.2d 878, 880–81 (2d Cir. 1937).

10. See, e.g., Burroughs Bldg. Material Co. v. Commissioner, 47 F.2d 178 (2d Cir. 1931).

"To say that * * * the expenses * * * were extraordinary or unnecessary would be to ignore the ways of conduct and the forms of speech prevailing in the business world."

■ To the extent that the equation of illegality with extraordinary and unnecessary is not question begging, it is applying special meanings to "ordinary and necessary" which are not applied in other connections. So long as the expense arises out of the conduct of the business and is a required outlay it ought to be considered ordinary and necessary.

As to public policy the Supreme Court held in Lilly v. Commissioner, 343 U.S. 90, 96–97, 72 S.Ct. 497, 501, 96 L.Ed. 769 (1952):

"Assuming for the sake of argument that, under some circumstances, business expenditures which are ordinary and necessary in the generally accepted meanings of those words may not be deductible as 'ordinary and necessary' expenses under § 23(a) (1) (A) [Section 162(a)] when they 'frustrate sharply defined national or state poli-

cies proscribing particular types of conduct,' * * * nevertheless the expenditures now before us do not fall in that class. The policies frustrated must be national or state policies evidenced by some governmental declaration of them." [11]

There has been no "governmental declaration" of any "sharply defined" national or state policy of discouraging the hiring of counsel and the incurring of other legal expense in defense against a criminal charge. In fact it is highly doubtful whether such a public policy could exist in the face of the Sixth Amendment's guaranty of the right to counsel.[12]

The rule of disallowance of legal expenses in the case of unsuccessful defenses has been adversely criticized by numerous commentators.[13]

Adherence to the rule has led to anomalous, arbitrary, artificial and conflicting results. The attempt to apply a rule which seeks to distinguish between civil and criminal liability and successful and unsuccessful defenses has caused repeated difficulty in borderline cases. A disbarment proceeding, for example, has been classified as criminal and the legal

11. Quoting Commissioner v. Heininger, 320 U.S. at 473, 64 S.Ct. 249. See also Tank Truck Rentals, Inc. v. Commissioner, 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958); Commissioner v. Sullivan, 356 U.S. 27, 78 S.Ct. 512, 2 L.Ed.2d 559 (1958).

12. See Powell v. State of Alabama, 287 U.S. 45, 68–69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932):
"The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare

his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence."

13. See, e.g., Arent, Inequities in Non-Deductibility of Fines, Penalties, Defense Expense, 87 J. Accountancy 482, 485–86 (1949); Brookes, Litigation Expenses and the Income Tax, 12 Tax L.Rev. 241 (1957); Keesling, Illegal Transactions and the Income Tax, 5 U.C.L.A.L.Rev. 26, 33–40 (1958); Paul, supra note 7; Reid, Disallowance of Tax Deductions on Grounds of Public Policy—a Critique, 17 Fed.B.J. 575 (1957); Stapleton, The Supreme Court Redefines Public Policy, 41 Taxes 641 (1952); Note, Public Policy and Federal Income Tax Deductions, 51 Colum.L.Rev. 752, 756–58 (1951); Note, Deduction of Business Expenses: Illegality and Public Policy, 54 Harv.L.Rev. 852, 854–57 (1941); Comment, Business Expenses, Disallowances, and Public Policy, 72 Yale L.J. 108, 132–36 (1962).

expenses disallowed.[14] Legal expenses paid in behalf of an employee who was found guilty of violating certain sections of the California administrative code relating to horse-racing and who, as a result, lost his license as a trainer, were held deductible, but the court said that had the employee paid his own expenses they "probably" would not have been deductible by him.[15] A taxpayer was permitted to deduct attorney's fees in connection with settlement of a civil liability for assault,[16] while another taxpayer's legal expenses in defending an action for defrauding the government were disallowed.[17] When the taxpayer finally pleaded *nolo contendere*, the legal expenses of an unsuccessful trial and a successful appeal (i. e., successful in securing a new trial) were disallowed.[18] Legal fees expended in an unsuccessful attempt to avoid a prosecution resulting in conviction are not deductible.[19] Where a taxpayer pleaded *nolo contendere* to an indictment for tax evasion and the Tax Court later found that there was no fraud or fraudulent evasion for the years in question, the legal expenses connected with the indictment were held to be non-deductible.[20] On the other hand, legal expenses in connection with an unsuccessful defense against civil liability for taxes are deductible even where a fraud penalty is assessed.[21] The Commissioner disallows legal expenses in government actions under the antitrust laws but allows deduction of such expenses in private actions.[22]

This is the first occasion that we have had since Heininger and Lilly to reexamine our rule as to deductibility of legal expenses for an unsuccessful defense connected with the carrying on of a trade or business. We hold, following Heininger, that such expenses are ordinary and necessary within the meaning of the statute. We find no sharply defined public policy against the allowance of such deductions, as is required by Lilly. We therefore refuse to continue to draw any distinction in deductibility between civil and criminal cases or between successful and unsuccessful defenses. We hold that legal expenses are deductible where they arise out of and are immediately or proximately connected with, and are required for, the conduct of a trade or business.

Reversed.

MOORE, Circuit Judge, took no part in the consideration or decision of this case.

LUMBARD, Chief Judge, with whom WATERMAN and KAUFMAN, Circuit Judges, join (concurring).

While concurring in Judge Hays' opinion for the court, I wish to add a brief word. In our decision in Burroughs Bldg. Material Co. v. Commissioner, 2 Cir., 47 F.2d 178, 180 (1931), we disallowed expenses incurred in the unsuccessful defense of criminal charges on the ground that to do so would be contrary to public policy. In my opinion, there is no present basis for the claim that such disallowance is consistent with public policy; on the contrary, it seems clear to me that public policy now requires us to allow the deduction.

Since Burroughs was decided, the federal courts have given fuller meaning to the Sixth Amendment, which guarantees to every defendant the right to be represented by counsel.

14. Estate of G. A. Buder, T.C.Memo. 1963-73, 22 CCH Tax Ct.Mem. 300, aff'd on other issues, 330 F.2d 441 (8th Cir. 1964).

15. Robert S. Howard, 32 T.C. 1284, 1296 (1959).

16. John W. Clark, 30 T.C. 1330 (1958).

17. David R. Faulk, 26 T.C. 948 (1956).

18. Standard Coat, Apron & Linen Serv., 40 T.C. 858 (1963).

19. Tracy v. United States, 284 F.2d 379 (Ct.Cl.1960). But see Commissioner v. Schwartz, 232 F.2d 94 (5th Cir. 1956).

20. Bell v. Commissioner, 320 F.2d 953 (8th Cir. 1963).

21. Hopkins v. Commissioner, 271 F.2d 166 (6th Cir. 1959).

22. Rev.Rul. 64-224, 1964 Int.Rev.Bull. No. 33, at 13.

In 1938 the Supreme Court held in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, that counsel must be furnished an accused who is financially unable to retain his own counsel to defend him on federal charges. A few months ago Congress at long last realized that the right to counsel has little substance unless counsel is paid for his efforts and reimbursed for necessary expenses. Under the provisions of the Criminal Justice Act, 18 U.S.C. § 3006A, which became law on August 20, 1964, a defendant who is found to be financially unable to provide counsel and defray defense expenses is now entitled to have such reasonable and necessary expenses paid by the government up to specified maximum amounts.

The assignment and compensation of counsel under the Criminal Justice Act do not depend on whether a defendant successfully asserts his innocence. Indeed, almost all of counsel's labors ordinarily must be done and his expenses must be incurred before guilt or innocence is finally established. The defendant has the right to put the government to its proof, if he so elects. His right to counsel does not depend upon whether in fact he has a defense or whether it was reasonable to contest the charges. Surely it needs no argument to support the proposition that unless a defendant has the benefit of counsel who can give necessary attention to the charges and their defense—and in cases such as Tellier's, this is usually a considerable task for conscientious counsel—he may not be in a position to make an intelligent and knowing decision as to whether or how to conduct a defense. Moreover, whether he stands trial or pleads guilty, he needs counsel who has thoroughly familiarized himself with the case and who can plead for his client in the light of such knowledge. If the compensation of counsel under the Criminal Justice Act does not depend on the success of the defense, it would seem to follow that the allowance of the deduction should not depend on the outcome in cases where the defendant is able to and does assume the financial burden of defending against criminal charges.

In holding that a financially able defendant may deduct as "ordinary and necessary" expenses the legal fees and expenses incurred in an unsuccessful defense, we are being consistent with a clearly evinced policy that a defendant be represented by counsel regardless of the ultimate success or failure of his defense.

As there is no provision of the tax laws which requires a contrary result, I agree that we should not impose an additional penalty on financially able defendants by refusing a deduction in such cases. The allowance of the deduction here sought is consonant with public policy and ought to be allowed. I think the teaching of Johnson v. Zerbst, supra, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and the Criminal Justice Act requires this result and that we are no longer bound by Burroughs.

WATERMAN, Circuit Judge (concurring).

I concur in the opinion written for the Court by Judge Hays and I also concur in Chief Judge Lumbard's additional separate concurrence.

KAUFMAN, Circuit Judge (concurring).

I concur in the opinions of both Judge Hays and Chief Judge Lumbard.