GERALD W. JORDAN AND GAY JORDAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jordan v. Commissioner
Docket No. 33170-87
United States Tax Court
T.C. Memo 1991-50; 1991 Tax Ct. Memo LEXIS 67; 61 T.C.M. (CCH) 1804; T.C.M. (RIA) 91050; February 7, 1991, Filed *67 Decision will be entered under Rule 155. W. Curtis Elliott, Jr. and William R. Culp, Jr., for the petitioners. Andrew J. Dempsey, for the respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency
1982
$ 7,385.26
1983
6,797.37
Petitioners operated a distributorship for the Amway Corporation (Amway) that generated substantial gross income in 1982 and 1983. Respondent concedes that petitioners' Amway distributorship constituted a trade or business operated for profit, and respondent for 1982 and 1983 has allowed petitioners substantial business expense deductions relating to their Amway distributorship. [1] At issue are certain further business expense deductions relating to petitioners' Amway distributorship that were claimed by petitioners on their Federal income tax returns but denied by respondent on the ground that the business purpose for the expenses has not been adequately established.
*68 FINDINGS OF FACT Certain facts have been stipulated and are so found. Petitioners are married and filed joint Federal income tax returns for 1982 and 1983. Petitioners resided in Kingsport, Tennessee, at the time their petition was filed. Since September of 1971, petitioners have been Amway distributors. Amway is a privately owned company that sells household and personal products through a network of independent distributors. Many Amway distributors, including petitioners, work in husband-wife teams and conduct their Amway activities on a part-time basis, in addition to having full-time jobs. In theory, Amway distributors generate receipts by selling products out of their homes directly to customers, and by recruiting new distributors who become down-line distributors of the sponsoring distributor and a part of his or her sales organization. Each down-line distributor, in turn, can sponsor additional new distributors, all of whom become a part of the initial distributor's Amway organization, which organization can grow to unlimited width and depth. Amway does not assign exclusive geographical territories to any distributors. In accordance with a complex formula, a distributor *69 receives bonuses and commissions from Amway based on the sales volume of his or her entire sales organization, including direct sales to customers and the sales made by down-line distributors. The distributor is also responsible for paying performance bonuses to down-line distributors. Initially, new distributors purchase all Amway products from their immediate up-line sponsor. Once, however, a distributor's sales organization reaches a certain level of monthly sales volume, the distributor becomes a "direct distributor" and purchases products directly from Amway. Obviously, it is in the best interest of each distributor to have down-line distributors who successfully sell products and who recruit productive additional down-line distributors. There are several levels of direct distributors, based on progressively higher levels of monthly sales volume. In ascending order, the levels of direct distributors are Ruby, Pearl, Emerald, Diamond, Double Diamond, Triple Diamond, Crown, and Crown Ambassador. As explained, respondent has stipulated that petitioners' Amway distributorship constituted a trade or business during 1982 and 1983. Petitioners were Pearl level direct distributors, *70 and their organization consisted of over 400 down-line distributors that went as far as 12 levels deep. For a number of years, petitioners' receipts from their Amway distributorship had been substantial, and in 1982 and 1983 the gross income was $ 42,882 and $ 41,613, respectively. During 1982 and 1983, petitioner Gay Jordan spent approximately 40 to 60 hours per week working on matters pertaining to the Amway distributorship. Her primary responsibilities included general office work (for example, correspondence, telephone calls, scheduling appointments, and making bank deposits), bookkeeping, managing and training downline distributors, ordering, processing and delivering products, and recruiting new down-line distributors. Petitioners have one child, Stacey, who was born on October 28, 1968. During 1982 and 1983, petitioner Gerald Jordan was a fulltime employee of Tennessee Eastman Company (Tennessee Eastman). He also worked an average of 20 to 25 hours per week on matters pertaining to his and his wife's Amway distributorship. Gerald Jordan frequently spent weekday lunch hours meeting with current and prospective down-line distributors. Gay Jordan occasionally joined her *71 husband at these luncheon meetings. Petitioners spent many evenings and weekends on Amway activities, making presentations to potential new distributors, following up with down-line distributors, training and motivating current down-line distributors, consulting with their up-line distributors, and attending Amway meetings, conferences, and conventions. Frequently, following evening Amway presentations, Gerald Jordan would adjourn to a local coffee shop or restaurant to continue discussing the Amway business and products with a small group of potential down-line distributors. Gerald usually paid the relatively modest bill for coffee and light refreshments at these discussions. Documentation of Gerald Jordan's expenses relating to his luncheon and evening meetings in connection with the Amway distributorship consists primarily of a combination of receipts (some of which bear notations of the names of individuals in attendance at the meetings) and an appointment book with names written in next to "lunch" or "dinner." Occasionally, petitioners' Amway activities involved out-of-town overnight travel to meetings and conventions sponsored by the national or regional Amway organization. *72 Petitioners used their personal automobile to travel to these meetings and conventions, except for one trip on which they flew. The schedule set forth below reflects petitioners' overnight travel in 1982 and 1983 relating to these Amway sponsored meetings and conventions. Most of the trips appear to have been taken by both petitioners or by Gerald alone. Receipts for trips numbered 1 and 7 in 1983 indicate that three individuals stayed in the hotel room, and presumably petitioners' daughter Stacey accompanied her parents on those trips. Nights Away
Location
from Home
Mileage
1982
1.
Cincinnati, OH
& Richmond, IN  2
894  2.
Atlanta, GA
* 2
669  3.
Charlotte, NC
* 2
580  4.
Kansas City, MO
air    & Indianapolis, IN  3
travel
5.
VA Beach, VA
* 7
1,012  6.
Gatlinburg, TN
2
116  7.
Charlotte, NC
2
427  8.
Washington, DC
3
807  9.
W. Palm Beach, FL
4
2027  1983
1.
Knoxville, TN
3
266  2.
Lynchburg, VA
1
413  3.
Knoxville, TN
2
235  4.
Charlotte, NC
3
507  5.
Charlotte, NC
2
399  6.
Pigeon Forge, TN
1
224  7.
Knoxville, TN
4
219  8.
Pile Island, GA
3
620  9.
Charlotte, NC
3
450  10.
Nashville, TN
2
601  11.
Fairfield Glade, IN
1
406  12.
Charlotte, NC
2
557  *73 The meetings and conventions petitioners attended while on the above overnight trips were similar in nature. Motivational talks were given by the most successful (usually Diamond level or above) Amway distributors. The presentations included some training lectures and the introduction of new products. Mrs. Jordan took detailed notes relating to presentations made at the meetings and conventions. Typically, the meetings and conventions began on Friday evening at 7:00 or 8:00 p.m., adjourned at 1:00 or 2:00 a.m., started again Saturday morning at 9:30 a.m., continued throughout the day, with several hours off during the afternoon, and adjourned again late Saturday evening or early Sunday morning. Sunday there would often be optional worship services offered in the morning and small group meetings for several hours in the afternoon. Most of the meetings and conventions *74 were attended by several thousand people, and petitioners often attended with a significant contingent of down-line distributors from their organization. The Amway annual voting members convention, which petitioners attended in June of 1982 and 1983, included the election of the board of directors of the Amway distributors' association and a demonstration of new Amway products to be introduced for the fiscal years beginning each September 1. Only Amway distributors who had reached the level of direct distributor or higher were eligible to vote at the annual conventions, and they had to be present to cast their votes. Approximately 10,000 people attended the Amway annual voting members conventions in 1982 and 1983. Occasionally petitioners participated in recreational activities during the conventions or weekend meetings. On October 13 through 17, 1982, at the Amway southeastern region distributors' meeting in West Palm Beach, Florida, Gerald Jordan played golf with several Diamond level direct distributors. Gerald regarded the golf game as an opportunity to discuss Amway business informally and to pick up pointers from highly successful Amway distributors. In June of 1982, *75 Gerald Jordan also participated in a fishing trip during the Hale reunion seminar in Virginia Beach, Virginia. With some regularity, petitioners were involved in recruiting and training new down-line distributors several levels below them (especially if the immediate sponsors were relatively new to Amway or geographically remote and unable to travel), and a number of petitioners' overnight trips related to such recruiting and training. At meetings held on those trips, petitioners presented the Amway sales marketing plan to potential new down-line distributors. The overnight trips petitioners took for recruiting and training are reflected in the schedule set forth below. Again, most trips appear to have been taken by petitioners together or by Gerald Jordan alone, except for trips in 1982 numbered 7, 9, and 11, on which Stacey apparently accompanied petitioners. Nights Away
Location
from Home
Mileage
1982
1.
Canton, NC
1
262
2.
Baltimore, MD
1
793
3.
Baltimore, MD
2
598
4.
Abbeyville, AL
1
807
5.
Baltimore, MD
2
1352
6.
Chesapeake, VA
2
1071
7.
Sandusky, OH
2
1494
8.
Lafayette, IN
2
775
9.
Baltimore, MD
& Chesapeake, VA  2
902
10.
Chesapeake, VA
2
894
11.
Chesapeake, VA
3
900
1983
1.
Cincinnati, OH
& Kokomo, IN  2
-0-
2.
Cincinnati, OH
& Kokomo, IN  2
1127
3.
Cincinnati, OH
& Kokomo, IN  1
1351
4.
Winston-Salem, NC
& Charlotte, NC  1
626
5.
Cincinnati, OH
2
701
6.
Cincinnati, OH
2
600
*76 At the beginning of 1982, petitioners owned five automobiles: a 1981 Cadillac; a 1979 Trans Am; a 1978 Firebird; a 1977 Cadillac; and a 1976 Chevrolet Blazer. Until sometime in February of 1982, Gerald Jordan used the 1976 Blazer as his primary vehicle for commuting to work at Tennessee Eastman. In February of 1982, Gerald traded the Blazer for a 1982 Jeep Eagle, which then became his primary commuting vehicle. In May of 1983, Gerald traded the Jeep Eagle for a 1983 Pontiac 6000, which he then used for commuting during the remainder of 1983. During 1982 and 1983, the 1979 Trans Am, the 1978 Firebird, and the 1977 Cadillac were used only for personal travel, and petitioners apparently claimed no business expenses with regard to the use of those automobiles. At the end of each week, Gerald Jordan estimated and recorded in a written log the mileage incurred on the 1981 Cadillac, the 1982 Jeep Eagle, and the 1983 Pontiac 6000. The odometer readings reflected in Gerald's log do not in all instances conform with odometer readings taken when the cars were purchased or repaired. Notations in the logs regarding the purpose of local trips were cryptic and often consisted of no more *77 than "lunch with" and a last name. Although, as explained, the Jeep Eagle and the Pontiac 6000 were used primarily for commuting, Gerald Jordan frequently conducted Amway business on his lunch hour or immediately after work, and therefore he also used those vehicles for Amway business purposes. The 1981 Cadillac was used primarily for Amway business. Respondent has conceded that the 1981 Cadillac, the Jeep Eagle, and the Pontiac 6000 were used for Amway business purposes, and the parties have stipulated that the only issue for decision regarding the vehicles is what percentage of the total use of the three vehicles related to petitioners' Amway distributorship. Respondent contends that the appropriate percentage of business use was significantly smaller than that claimed by petitioners. The following schedule reflects the percentage of business use claimed by petitioners and allowed by respondent. 1981
1982
1983 Cadillac
Jeep Eagle
Pontiac
1982
Claimed by petitioner
100%
56%
-0- Allowed by respondent
26%
18%
-0- 1983
Claimed by petitioner
100%
40%
71%
Allowed by respondent
26%
19% 22%
Petitioners' daughter, Stacey, who was 14 and 15 years *78 old during 1982 and 1983, assisted in petitioners' Amway distributorship an average of 10 to 20 hours per week. Stacey kept some records of her work in a notebook, and periodically she and Gerald discussed the amount and difficulty of the work she had completed and the pay she should receive. Stacey was not paid at a set hourly rate. Stacey's responsibilities included handling telephone calls, keeping records of orders, sorting and boxing products to be shipped, and cleaning the meeting and storage rooms containing Amway products. During 1982, Stacey was paid approximately once a month in amounts ranging from $ 25 to $ 465, for a total of $ 1,620. During 1983, Stacey was paid approximately twice a month in amounts ranging from $ 12 to $ 275, for a total of $ 2,940. [2]
During 1982 and 1983, petitioners sponsored several sales contests *79 and promotions for their down-line distributors. For example, in a cash-drawing bonus, each down-line distributor who made $ 100 in retail sales in a week was eligible to draw an envelope that contained a "mystery amount" of cash, generally ranging from $ 1 to $ 50. Promotional prizes were offered by petitioners to individuals who allowed down-line distributors to conduct Amway product demonstrations in their homes. Petitioners have submitted receipts showing expenditures of $ 3,415 in 1982 and $ 1,452 in 1983 relating to such prizes and awards. Petitioners also made various business gifts to Amway associates in 1982 and 1983. Petitioners received assistance from their up-line distributors and petitioners periodically made gifts to them. Receipts have been offered that substantiate expenditures of $ 545 in 1982 and $ 393 in 1983 relating to such gifts. Documentation for the gifts indicates the dates of purchase and usually reflects a notation such as "plaque to John Cameron, Centerbrook," "flowers to John Meade, Coeburn, Va.," "gift to Jim & Kathy Paullin, Atlanta, Ga.," "Toby's birthday," and "shower gift." Several people were given more than one gift per year; for example *80 in 1982, four gifts with a total value of $ 143 were given to Ron and Toby Hale. Included in petitioners' 1982 and 1983 Federal income tax returns were two Schedule C's, one relating to petitioners' Amway distributorship and one relating to petitioners' activities promoting Amway products and training Amway down-line distributors. For convenience, we have combined the two Schedule C's in each year. The following tables show, for each expense item on the Schedule C's, the amounts originally claimed as deductible by petitioners, the amounts allowed and disallowed by respondent (as reflected in respondent's notice of deficiency), and the amounts still at issue. 1982
Allowed in
Notice of Still Claimed
Deficiency
Disallowed at issue
Bad debts
$ 23    $ 23    $ -0-   $ -0-   Bank service
charges  49
49
-0-
-0-
Car expense
6,618
1,448
5,170
3,997
Commissions
17,796
17,796
-0-
-0-
Depreciation:
Cadillac   3,480
564
2,916
2,916
Eagle   1,843
527
1,316
1,316
Home office   800
800
-0-
-0-
Dues &
publications   268
268
-0-
-0-
Freight
289
289
-0-
-0-
Insurance
909
757
152
-0-
[3]Local meals 804
-0-
804
652
Office supplies
1,286
1,286
-0-
-0-
Rent
720
695
25
-0-
Repairs
767
599
168
-0-
Supplies
742
742
-0-
-0-
Taxes
306
306
-0-
-0-
[4]Out-of-town-travel 4,448
950
3,499
3,347
Utilities & phone
1,726
1,726
-0-
-0-
Stacey's wages
1,458
-0-
1,458
1,458
Standing order
charges   960
960
-0-
-0-
Handling charges
266
94
172
-0-
Servicing fees
367
367
-0-
-0-
Prizes
3,761
1,523
2,238
2,238
Gifts
267
-0-
267
267
Demos & samples
377
377
-0-
-0-
Food & meeting
supplies   794
776
17
-0-
Seminars &
training   426
426
-0-
-0-
[5]TOTAL $ 51,549
$ 33,346
$ 18,202
$ 16,191
*81 1983
Allowed in
Notice of Still Claimed
Deficiency
Disallowed at issue
Advertising
$ 218   $ 218   $ -0-   $ -0-   Bank service
charges   68
68
-0-
-0-
Car expense
5,168
1,375
3,793
3,586
Commissions
18,471
18,653
-0-
-0-
Depletion
204
-0-
204
-0-
Depreciation:
Cadillac   3,480
564
2,916
2,916
Pontiac   2,543
964
1,580
1,580
Home office   800
800
-0-
-0-
Heat pump   -0-
204
-0-
-0-
Dues &
publications   131
131
-0-
-0-
Freight
670
671
-0-
-0-
Insurance
244
244
-0-
-0-
Office expense
543
543
-0-
-0-
Repairs
2,678
667
2,011
-0-
Supplies
399
399
-0-
-0-
Taxes
395
395
-0-
-0-
[6] Out-of-town travel 3,124
-0-
3,124
3,124
Utilities & phone
1,922
1,922
-0-
-0-
Stacey's wages
2,683
-0-
2,683
2,683
Servicing fee
192
192
-0-
-0-
Handling charges
168
168
-0-
-0-
Standing order
charges   623
623
-0-
-0-
[7]Local meals 2,188
628
1,560
1,729
Prizes
-0-
-0-
-0-
1,452
Gifts
757
-0-
757
757
Demos & samples
76
76
-0-
-0-
Room rental
449
449
-0-
-0-
Seminars &
training   1,245
-0-
1,245
-0-
[8]TOTAL $ 49,439
$ 29,952
$ 19,873
$ 17,827
*82 The following table shows the gross income (apparently net of cost of goods sold), total expenses, and net income of petitioners with regard to their Amway distributorship as reported on their Federal income tax returns and as determined in respondent's notice of deficiency. Per Notice Per Return
of Deficiency
1982
Amway gross income
$ 42,882 $ 42,882
Amway total expenses
51,549 33,346
Amway net income (loss)
$ (8,667)
$ 9,536
1983
Amway gross income
$ 41,613 $ 41,613
Amway total expenses
49,439 29,952
Amway net income (loss)
$ (7,826)
$ 11,661
Respondent has conceded the deductibility of expenses relating to some of the overnight trips petitioners took to Amway-sponsored meetings and *83 conventions. In addition, respondent conceded at trial that all of the amounts at issue with regard to out-of-town travel, entertainment, and local meals have been substantiated for purposes of section 274(d) [9], but respondent has reserved the question of whether such expenses qualify as ordinary and necessary expenses under section 162. OPINION As indicated in the above schedules, there are six categories of deductions remaining at issue: (1) Local meals -- $ 652 for 1982 and $ 1,729 for 1983; (2) out-of-town travel -- $ 3,347 for 1982 and $ 3,124 for 1983; (3) car expenses and depreciation -- $ 8,229 for 1982 and $ 8,082 for 1983; (4) amounts paid to petitioners' daughter Stacey -- $ 1,458 for 1982, $ 2,683 for 1983; (5) prizes -- $ 2,238 for 1982 and $ 1,452 for 1983; and (6) gifts -- $ 267 for 1982 and $ 757 for 1983. The primary issue for decision is whether these expenses satisfy *84 the ordinary and necessary requirements of section 162. With regard just to the gifts, we also must decide whether the substantiation requirements of section 274(d) have been satisfied. We reiterate that respondent has expressly conceded the for-profit issue under section 183 that typically is involved in Amway-related cases. Section 162 allows a deduction for all ordinary and necessary expenses of carrying on a trade or business. Generally, to be deductible under section 162, expenses must be directly connected with or pertaining to the taxpayer's trade or business. Sec. 1.162-1(a), Income Tax Regs.
The term "ordinary" is used principally to distinguish currently deductible expenses from capital expenditures, which must be amortized over the useful life of an asset. Commissioner v. Tellier, 383 U.S. 687, 689-690, 16 L. Ed. 2d 185, 86 S. Ct. 1118 (1966), affg. 342 F.2d 690 (2d Cir. 1965), revg. a Memorandum Opinion of this Court; Welch v. Helvering, 290 U.S. 111, 113-116, 78 L. Ed. 212, 54 S. Ct. 8 (1933). The term "necessary" imposes the requirement that the expenses be "appropriate and helpful" to development of the taxpayer's business. Commissioner v. Tellier *85 , supra at 689; Welch v. Helvering, supra at 113. Section 162(a)(1) allows the deduction of "a reasonable allowance for salaries or other compensation for personal services actually rendered." In order to deduct gifts under section 162, section 274(d) imposes additional substantiation requirements. Specifically, the taxpayer must have adequate records or sufficient evidence to corroborate his or her own statements regarding the cost of the gifts, the date and description of the gifts, the business purpose of the gifts, and the business relationship to the taxpayer of the persons receiving the gifts. Section 274(b) limits the deductible amount relating to business gifts to any one person in a given year to $ 25. Section 262 provides that, except as otherwise expressly allowed, no deductions for personal, living, or family expenses shall be allowed. Local Meals
Respondent urges us to disallow as personal expenses under section 262, petitioners' expenses for local meals, consisting primarily of weekday luncheons and evening refreshments. Petitioners contend that the local meals related to Amway meetings and involved many different people from *86 their Amway organization, rather than the same people on every occasion. Thus, petitioners contend that the expenses of local meals qualify as ordinary and necessary expenses of their Amway distributorship. While the number of occasions when petitioners paid for local meals is not entirely clear from the record, we believe petitioners' estimates are approximately correct. For 1982, 87 local meals at a total cost of $ 804 comes to $ 9.24 for each local meal, presumably for at least two people. For 1983, 240 local meals at a total cost of $ 1,560 comes to $ 6.50 for each local meal, again for at least two people. We note that the situation before us differs from Moss v. Commissioner, 80 T.C. 1073 (1983), affd. 758 F.2d 211 (7th Cir. 1985) relied upon by respondent, which involved daily partnership business luncheon meetings. We are convinced that petitioners paid for a significant number of local meals during 1982 and 1983 that related primarily to their Amway distributorship. See Wedemeyer v. Commissioner, T.C. Memo 1990-324. Petitioners, however, have not met their burden of proving that all of the expenses they incurred *87 for local meals were ordinary and necessary expenses of their Amway distributorship. Petitioners' recordkeeping was not sufficient to enlighten us as to the appropriateness or helpfulness of many of the expenses of the local meals. On the evidence before us, we find that petitioners are entitled to deduct additional expenses for local meals in the amount of $ 400 for 1982 and zero for 1983. Out-of-town Travel
Respondent asserts that petitioners are not entitled to deduct the expenses of attending certain Amway meetings and conventions. Respondent argues that petitioners attended the meetings and conventions primarily for personal social reasons. Respondent also argues that petitioners should not be allowed to deduct their expenses of traveling to recruit and train down-line distributors for whom they were not direct sponsors. Respondent argues that taking such trips was not a good business practice and that the trips cost more than petitioners could possibly generate in sales commissions and bonuses. Petitioners contend that attendance at the Amway meetings and conventions was ordinary and necessary because it helped them train and motivate their down-line Amway distributors. *88 They claim that it was a common, ordinary and necessary practice for owners of large Amway distributorships to attend these meetings and also to incur reasonable travel expenses in recruiting and training down-line distributors. On the evidence before us in this case, we conclude that the expenses petitioners incurred in attending the Amway meetings and conventions constituted ordinary and necessary business expenses. The agendas of the meetings and Mrs. Jordan's extensive notes taken at the meetings demonstrate that most of petitioners' time at the meetings was devoted to business. It was especially appropriate that petitioners attend the Amway conventions as over 100 of petitioners' down-line distributors attended the Amway conventions at issue. Petitioners' Amway distributorship relied heavily on novice or part-time salespeople, and frequent motivational meetings appear to have been helpful to sustaining the sales and growth of petitioners' distributorship. In addition, because petitioners' organization was dispersed over a large area as it branched out through an increasing number of down-line distributors, it was not always possible to have local sponsors conduct the necessary *89 training. Petitioners have met their burden of proving that the trips to recruit and train down-line distributors were taken for business purposes, and that they were appropriate and helpful under the test of Welch v. Helvering, supra.
It is not entirely clear from the record whether petitioners are claiming the expenses for their daughter Stacey, who apparently accompanied them on several trips. No effort was made to show that the expenses of Stacey's travel constituted ordinary and necessary business expenses. We hold that the expenses at issue for out-of-town travel are allowed, but only to the extent that they relate to expenses attributable to petitioners' travel and not to their daughter's travel. Automobile Expenses and Depreciation
Respondent argues that the automobile expenses and depreciation at issue were personal expenses. Petitioners maintain that their mileage logs are sufficient to prove the business mileage claimed. We are not convinced that none of the mileage in dispute related to petitioners' personal social activities, and petitioners have not met their burden of proving that the claimed mileage related to their Amway distributorship. *90 In light of all the evidence, we find that the appropriate percentage of business use of the vehicles are as follows: 1981
1982
1983 Cadillac
Jeep Eagle
Pontiac
1982
60%
18%
-0- 1983
60%
19%
22%
Payments to Stacey
Respondent contends that amounts petitioners paid to their daughter Stacey are not deductible because petitioners have not proven that the amounts were reasonable or that the amounts were paid for services actually rendered. Petitioners assert that Stacey worked an average of 10 to 20 hours per week helping with the Amway distributorship and that she was paid at the reasonable rate of approximately $ 2 to $ 3 per hour, depending on the nature and difficulty of the work. Although payments for services rendered by minor children to a related party must be carefully scrutinized, they are not automatically disallowed. See Eller v. Commissioner, 77 T.C. 934 (1981); Denman v. Commissioner, 48 T.C. 439 (1967). Here, it is clear that Stacey participated in her parents' Amway distributorship and that she rendered services to the distributorship on a regular basis. However, we are troubled by petitioners' *91 recordkeeping regarding Stacey's work. Based on the evidence before us regarding the payments to Stacey, we allow as deductions under section 162 $ 1,000 in 1982 and $ 1,500 in 1983. Prizes
Respondent maintains that petitioners have failed to meet their burden of proving the business purpose under section 162 of the prizes given to Amway associates during 1982 and 1983. Petitioners assert that the receipts and canceled checks submitted as evidence adequately support their claim to these deductions. Petitioners further state that the prizes awarded were effective in increasing the sales of Amway products. Petitioners rely on Rev. Rul. 69-510, 1969-2 C.B. 23, for the proposition that prizes given to customers are deductible business expenses. After examination of the record, we hold that petitioners are entitled to deduct additional expenses of $ 1,892 for 1982 and $ 1,452 for 1983 relating to the prizes. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). These amounts were substantiated and represent prizes awarded to down-line distributors and customers for motivational purposes. See McCue v. Commissioner, *92 T.C. Memo 1983-580. Gifts
Respondent asserts that petitioners have failed to meet their burden of proving the deductibility under section 274 of expenses relating to the gifts made to their Amway associates during 1982 and 1983. Petitioners maintain that the receipts and canceled checks submitted as evidence support their claim to these deductions. Section 274 provides more stringent substantiation requirements than section 162. Each requirement of section 274 must be proven for each expense. General, vague proof does not meet the rigorous requirements of section 274. Smith v. Commissioner, 80 T.C. 1165, 1172 (1983). Substantiation of the business relationship, for example, must be particular as to name, title, or other specific designation. Dowell v. United States, 522 F.2d 708, 716 (5th Cir. 1975). On the evidence before us and in light of the requirements of section 274, we hold that petitioners are not entitled to deduct any of the amounts claimed as business gifts in 1982 or 1983. Decision will be entered under Rule 155.
Footnotes
1. The fact that petitioners' Amway distributorship generated substantial gross income and that respondent conceded that petitioners' Amway distributorship constituted a for-profit trade or business distinguishes this case from a number of cases previously litigated in this Court involving Amway distributors. See e.g., Elliott v. Commissioner, 90 T.C. 960 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990); Rubin v. Commissioner, T.C. Memo 1989-290↩.
*. Respondent has allowed the expenses claimed with respect to the 1982 trips numbered 2, 3, and 5 to Atlanta, GA, Charlotte, NC, and Virginia Beach, VA.↩
2. The differences between the total amounts paid to Stacey as documented by cancelled checks and the lesser amounts claimed as deductions by petitioners have not been explained.↩
3. Listed as "advertising" on petitioners' Schedule C.↩
4. Listed as "travel & entertainment" and "lodging & meals" on petitioners' Schedule C.↩
5. Due to rounding, the total amount reflected for some columns does not necessarily reflect the sum of the expenses in each column.↩
6. Listed as "travel & entertainment" and "lodging & meals" on petitioners' Schedule C.↩
7. Listed as "promotion expenses" on petitioners' Schedule C.↩
8. Due to rounding, the total amount reflected for some columns does not necessarily reflect the sum of the expenses in each column.↩
9. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue.↩